UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARIO OCAMPO,

                Plaintiff,

        -against-

BRIAN FISCHER, et al.,

                Defendants.
----------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-CV-4583 (CBA) (RER)

**AMON, United States District Judge**.

    Plaintiff Mario Ocampo brings this action against defendants Drs. Carl Koenigsmann and Felix Ezekwe, and Superintendent Dennis Breslin under 42 U.S.C. § 1983, alleging that they "fail[ed] to treat [his] Hepatitis C condition" while he was in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (D.E. # 57 ("Second Amended Complaint" or "SAC") ¶ 9.) Currently before the Court is defendants' motion for summary judgment. For the reasons stated below, the Court grants defendants' unopposed motion.

### BACKGROUND[1]

    Due to Ocampo's decision to not oppose defendants' motion, "the undisputed facts proffered by the movant [are] deemed admitted." Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014); see also Jones v. Lamont, No. 05-CV-8126 (LAK), 2008 WL 2152130, at *1 (S.D.N.Y. 2008) ("In view of [pro se] plaintiff's failure to respond to the motion, the well supported factual allegations set forth in defendants' Rule 56.1 statement are deemed admitted."), aff'd, 379 F. App'x 58 (2d Cir. 2010). In such cases, the Second Circuit has held that "there is no need for a

---

[1] These facts come from the Second Amended Complaint, Defendants' Local Rule 56.1 Statement (D.E. # 92, ("56.1")); and the affidavits and exhibits filed in support: (D.E. # 84 ("Boozer Decl."); D.E. # 85, ("Breslin Decl."); D.E. # 86 ("Ezekwe Decl."); D.E. # 87 ("Koenigsmann Decl."); D.E. # 88 ("Kortsen Decl."); and D.E. # 89 ("Kirby Rept.")).

1

district court to robotically replicate the defendant-movant's statement of undisputed facts and references to the record...." Id. The Court has reviewed the statements in defendants' Rule 56.1 statement and the evidence submitted in support; accordingly, it gives only a brief account of the undisputed facts.

## A. The Parties

Plaintiff Mario Ocampo was incarcerated at DOCCS' facilities between 1991 and May 2012. (SAC ¶¶ 12–15.) Between 2002 and 2011, Ocampo was incarcerated at Arthur Kill Correctional Facility ("Arthur Kill"). (Id.) Dr. Felix Ezekwe is a physician employed by DOCCS and served as a primary care physician at Arthur Kill between 2005 and 2007, and again between 2008 and November 2011. (56.1 ¶¶ 2–3.) However, he never served as Ocampo's primary physician, nor was he ever directly responsible for Ocampo's medical care or Hepatitis C treatment. (Id. ¶¶ 6–7.) Dr. Carl Koenigsmann has served as the chief medical officer of DOCCS since September 2010. (Id. ¶¶ 15–17.) He too was never directly responsible for Ocampo's medical treatment. (Id. ¶¶ 15–17.) Unlike the other two defendants, Dennis Breslin is not a medical professional. (Id. ¶ 9.) Instead, he served as the superintendent of Arthur Kill between 1998 and 2011. (Id.)

## B. Ocampo's Hepatitis C Diagnosis and Treatment: 2003 Through 2010

In 2002, Ocampo tested positive for Hepatitis C. (SAC ¶ 10.) Hepatitis C is a liver disease caused by the Hepatitis C Virus, ("HCV"), which can cause deleterious health effects, including scarring of the liver. (56.1 ¶ 19.) Between approximately 2001 and May 2011, the standard drug therapy for fighting Hepatitis C was a two-drug combination known as Dual Therapy, which consisted of pegylated interferon and ribavirin. (Id. ¶ 25.) Although Dual Therapy subsequently became the standard treatment for Hepatitis C, it posed significant side effects to those taking it.

(Id. ¶ 32; Bozer Decl. ¶ 19.) Dual Therapy was therefore not recommended for asymptomatic patients with normal levels of liver function. (Bozer Decl. ¶ 19.)

At the time of his diagnosis, Ocampo was asymptomatic. (56.1 ¶ 70.) He did not receive Dual Therapy or much of any other treatment for Hepatitis C from his diagnosis through July 2009. (Id. ¶ 62.) On September 25, 2008, a biopsy of Ocampo's liver revealed that he had cirrhosis. (Id. ¶ 62.) He was then treated with Dual Therapy from July 2009 through July 2010, but the treatment ultimately failed as it did not cure his Hepatitis C. (Id. ¶ 78.)

**C. March 2011 to May 2012: Ocampo Seeks Second Round of Dual Therapy**

In May 2011, the Food and Drug Administration approved two new drugs to treat Hepatatis C: (i) telaprevir and (ii) boceprevir. Telaprevir was then combined with Dual Therapy to form a three-drug regimen known as "Triple Therapy" to treat Hepatitis C. (Id. ¶ 35.) Triple Therapy thereafter became the standard treatment for Hepatitis C until the FDA approved new therapies in 2013 and 2014. (Koenigsmann Decl. ¶ 18; Bozer Decl. ¶ 21.)

Between March 2011 and June 2011, Ocampo made requests of his primary care physician, non-party Dr. Jean-Baptiste, for retreatment with Dual Therapy. (56.1 ¶ 79–82.) In June 2011, Dr. Jean-Baptiste submitted a request to Dr. Koenigsmann for Ocampo to receive retreatment for his Hepatitis C. (Id. ¶ 83; Koenigsmann Decl. ¶ 37.) At this time, Ocampo's blood tests indicated that he did not require emergency Hepatitis C drug therapy. (56.1 ¶ 84; Koenigsmann Decl. ¶ 84.) In response to Dr. Jean-Baptiste's request, Dr. Koenigsmann denied retreatment with Dual Therapy for two reasons: (i) Ocampo had already failed treatment with Dual Therapy in 2010 and there was no indication that retreatment would be any more successful than the first time; and (ii) he had previously suffered numerous life-threatening side effects with Dual Therapy, which could be expected to reoccur. (56.1 ¶ 85; Koenigsmann Decl. 40.) Dr. Koenigsmann also stated

3

that he was deferring Ocampo's treatment with Triple Therapy for two reasons: (i) DOCCS was still in the process of creating a protocol to ensure appropriate and safe administration of Triple Therapy and (ii) Ocampo had not yet completed the necessary tests to determine whether Triple Therapy was an appropriate treatment for him. (56.1 ¶ 86; Koenigsmann Decl. ¶ 41.)

In July 2011, Ocampo filed a grievance seeking retreatment with Dual Therapy. Superintendent Breslin responded to that grievance based on information that he received from the medical staff responsible for Ocampo's care, which had indicating that Ocampo would receive Triple Therapy treatment once DOCCS had a protocol in place and once Ocampo successfully completed his screening. (56.1 ¶¶ 90–94; Breslin Decl. ¶¶ 8–13.) Between July 2011 and his release in May 2012, Ocampo's primary care physicians—who are not defendants in this action—ordered testing to determine whether he was an appropriate candidate for Triple Therapy treatment. (56.1 ¶¶ 95–114.) Ultimately, in May 2012, Ocampo was released from DOCCS's custody before they could determine whether Triple Therapy treatment should be initiated. (Id. ¶ 115.) Following his release, Ocampo received treatment with a newly-released Hepatitis C drug, Harvoni. (Korsten Decl. ¶ 19.) He responded well to that treatment. (Id.)

## PROCEDURAL HISTORY

On February 14, 2017, Ocampo voluntarily dismissed his claim relating to his arterial disease and confirmed that his "sole remaining claim will be related to the negligence and malpractice as to defendants' treatment of his Hepatitis C." (D.E. # 74.) Ocampo's remaining claim alleges that each of the three defendants violated his Eighth Amendment rights by "fail[ing] to treat [his] Hepatitis C condition" while he was in the custody of DOCCS. (SAC ¶ 9.)

On July 10, 2017, defendants moved for summary judgment on Ocampo's claim. (D.E. # 82 ("Defs. Mem.").) After Ocampo failed to oppose that motion and did not respond to defendants'

4

inquiries about whether a response would be forthcoming, this Court ordered his counsel to show why he had not filed an opposition, warning him that his "failure to [respond] will result in the Court deeming the motion for summary judgment fully submitted." (D.E. dated Oct. 10, 2017.) Ocampo and his counsel ignored that order. Thereafter, the Court held a hearing where counsel for Ocampo stated that he had consulted with his client and informed him that he was not opposing defendants' motion because his case lacked merit.[2]

## STANDARD OF REVIEW

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there are issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation marks omitted). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. See, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004); Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

---

[2] Seven months after defendants moved for summary judgment, Ocampo filed a letter asking the Court to appoint pro bono counsel, apparently because he was dissatisfied with his current counsel. (D.E. # 93.) However, after review of the record, the Court has concluded that Ocampo's claims lack merit. See Phelan v. Sullivan, 541 F. App'x 21, 25 (2d Cir. 2013) (stating that the court would not appoint pro bono counsel because plaintiff had not demonstrated that his claims were likely to succeed on the merits); Justice v. Kuhnapfel, 982 F. Supp. 2d 233, 235 (E.D.N.Y. 2013) (denying plaintiff's motion to appoint counsel in a §1983 action where the plaintiff was unlikely to succeed on the merits). Accordingly, the Court denies Ocampo's motion to appoint new counsel.

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. See Fed. R. Civ. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986) (internal citations omitted).

Where, as here, the motion is unopposed, summary judgment, if appropriate, shall be entered against the non-moving party. Fed. R. Civ. Proc. 56(e). However, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." Vermont Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004); see also Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001) ("[W]hen a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.").

## DISCUSSION

Ocampo alleges that three defendants—Drs. Ezekwe and Koenigsmann, and Superintendent Dennis Breslin—violated his constitutional rights by "fail[ing] to treat [his] Hepatitis C condition." (SAC ¶ 9.) Ocampo's claims are based upon two different time periods

6

with varying degrees of treatment and symptoms: (1) "Plaintiff was eligible to receive Hepatitis C treatment in 2006, however, plaintiff did not begin . . . treatment until sometime in 2009," (SAC ¶ 12); and (2) "plaintiff began requesting a second round of treatment [in 2011] but was continually denied treatment" until his release in May 2012, (id. ¶ 14). For the reasons explained below, defendants are entitled to summary judgment on Ocampo's claims for both time periods.

### I. There Is No Evidence of Defendants' Personal Involvement in Ocampo's Treatment During the First Time Period

Defendants argue that there is no evidence that any of the defendants had any personal involvement with Ocampo's treatment, or non-treatment, during the time period between 2006 and 2009. (Defs. Mem at 14.) To state a claim under § 1983, a plaintiff must allege each defendant's direct and personal involvement in the constitutional deprivation. See Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). As a corollary, "[i]t is well established that 'a defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983.'" LaMagna v. Brown, 474 F. App'x 788, 789 (2d Cir. 2012); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted)). Instead, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." Grullon, 720 F.3d at 138 (collecting cases). Personal involvement may be shown by evidence that the defendant: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate

indifference to others' rights by failing to act on information indicating that unconstitutional acts were occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986).

### 1. Dr. Ezeweke

There is no evidence that Dr. Ezekwe had any personal involvement in any alleged constitutional violation between 2006 and 2009. Indeed, the Second Amended Complaint does not actually allege that Dr. Ezekwe had personal involvement in Ocampo's Hepatitis C treatment whatsoever. Moreover, there is no evidence that Dr. Ezekwe ever served as Ocampo's primary care physician. (56.1 ¶ 6; Ezekwe Decl. ¶ 4.) The evidence demonstrates that Dr. Ezekwe examined Ocampo only twice during this period—in June 2009 and November 2009 for health issues unrelated to his Hepatitis C. (See 56.1 ¶¶ 123–127; Ezekwe Decl. ¶¶ 15–17.) Accordingly, there is no evidence that Dr. Ezekwe was personally involved in decisions about the course of Ocampo's treatment for Hepatitis C during this time period.

### 2. Dr. Koenigsmann

Similarly, there is no evidence that Dr. Koenigsmann had personal involvement in Ocampo's treatment from 2006 through 2009. Indeed, the record evidence demonstrates that from April 2003 through September 2010, Dr. Koenigsmann served as the medical director of a region that did not include Arthur Kill, the facility at which Ocampo received his care. (Koenigsmann Decl. ¶ 4.) Accordingly, summary judgment is granted on Ocampo's claim against Dr. Koenigsmann for the 2006 through 2009 time period.

### 3. Superintendent Breslin

There is no evidence that Superintendent Breslin was personally involved with Ocampo's medical treatment or any decision to deny him medical care during this first time period. The

Second Amended Complaint does not allege Superintendent Breslin had involvement with Ocampo during this time. In addition to the lack of allegations supporting Breslin's direct participation, there is no evidence suggesting that he could be liable under any of the other factors noted in Colon, such as creating a policy governing Ocampo's medical care or negligently supervising his physicians. (Cf. Breslin Aff. ¶ 6 ("I never directly supervised any of the facility's medical staff, including [Ocampo's physicians], and I was never directly involved in the decisions concerning medical care.").) Therefore, the Court grants summary judgment on Ocampo's claims against Superintendent Breslin that are based upon the time period 2006 through 2009.

### II. Summary Judgment is Granted on Ocampo's Remaining Claims for the Time Period Between 2010 Through 2012

As for Ocampo's deliberate indifference claims based upon 2011 through 2012, defendants contend that there is no evidence that Dr. Felix Ezekwe or Superintendent Breslin were personally involved with Ocampo's Hepatitis C treatment during this time period. (Defs. Mem. at 17.) With regard to Dr. Koenigsmann, defendants argue that summary judgment should be awarded because Ocampo cannot satisfy either the objective or subjective prongs of a deliberate indifference claim. (Id.)

#### 1. Dr. Felix and Superintendent Breslin

The only allegation or evidence of Superintendent Breslin's involvement from 2011 through 2012 is that, in July 2011, Ocampo filed a grievance seeking a second round of drug therapy, and Superintendent Breslin responded to that grievance indicating that Ocampo "would be receiving treatment as soon as 'a protocol was in place.'" (SAC ¶ 16; 56.1 ¶ 90; Breslin Decl. ¶ 8.) That, however, is "insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly . . . ." Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002); see also McClenton v. Menifee, No. 05-CV-2844 (JGK), 2006 WL

2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("Judges in this district have found that a supervisor's mere denial of a grievance is insufficient to establish personal involvement; otherwise, senior administrative officials could generally be named as defendants in prison condition cases."). Thus, Superintendent Breslin "did not play either a direct or supervisory role in [Ocampo's] treatment, and therefore cannot be held liable for any deficiencies in [his] medical care." De Jesus v. Albright No. 08-CV-5804 (DC), 2011 WL 814838, at *6 (S.D.N.Y. Mar. 9, 2011).

Moreover, even if his response to Ocampo's grievance could demonstrate personal involvement, it is well-settled that when responding with information to a grievant, "a prison administrator is permitted to rely upon and be guided by the opinion of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so." Id.; see also Cuoco v. Moritsugo, 222 F.3d 99, 111 (2d Cir. 2000) (holding that prison warden was not liable for alleged failure to intervene because he "had no authority to intervene in an admittedly medical decision" made by doctors). The evidence here shows that Superintendent Breslin relied on the opinion of medical personnel in responding to Ocampo's grievance by reviewing a memo by a nurse that stated that "[Ocampo is] approved for 2nd treatment" and he "will receive it once NYS DOCC[S] has a protocol in place." (56.1 ¶¶ 91–93; Breslin Decl. ¶¶ 9–12.) In his response to Ocampo's grievance, Superintendent Breslin repeated what the nurse had told him: that the "grievant is approved for 2nd treatment" and the "[g]rievant will receive treatment once NYS DOCCS has a protocol in place." (56.1 ¶ 93; Breslin Decl. ¶ 12.) Accordingly, because there is no evidence that Superintendent Breslin did not rely on medical personnel in formulating his response to Ocampo, and all evidence is to the contrary, summary judgment is granted.

### 2. Dr. Ezewke

The record demonstrates that Dr. Ezewke examined Ocampo only once during the time period between 2010 and 2012. That examination was in March 2010 for complications stemming from Ocampo's vascular disease. (56.1 ¶ 128; Ezekwe Decl. ¶ 17.) There is no evidence that this examination had anything to do with Ocampo's Hepatitis C condition, that Dr. Ezewke knew Ocampo suffered from Hepatitis C, or that Dr. Ezewke was otherwise involved in any decision regarding Ocampo's course of treatment for that condition. Accordingly, summary judgment is granted on Ocampo's claim against Dr. Ezewke because there are no facts from which a reasonable juror could find him to have been personally involved in Ocampo's treatment for Hepatitis C.

### 3. Dr. Koenigsmann

The record demonstrates that Dr. Koenigsmann was the only defendant involved with Ocampo's Hepatitis C treatment during 2011 and 2012. Ocampo's claim is that he "began requesting a second round of treatment [in 2011] but was continually denied treatment" until his release from prison in May 2012. (SAC ¶ 14.) Defendants argue that summary judgment is warranted because there is no triable issue of fact on either prong of Ocampo's deliberate indifference claim. (Defs. Mem. at 17.)

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A prisoner must satisfy two requirements—one objective and one subjective in order to prevail on such a 'deliberate indifference' claim." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). First, the prisoner must prove that the alleged deprivation of medical treatment is—in objective terms—"sufficiently serious," that is, the prisoner must prove that his medical need was "a

condition of urgency, one that may produce death, degeneration, or extreme pain." See id. (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996))). Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). "This requires that the prisoner prove that the charged official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Johnson, 412 F.3d at 403 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Deliberate indifference exists when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66. "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." Smith v. Carpenter, 316 F.3d 178, 183–84 (2d Cir. 2002) (collecting cases). However, "[i]t is well-established that Hepatitis C qualifies as a serious medical condition for purposes of an Eighth Amendment analysis." Pabon v. Wright, No. 99-CV-2196 (WHP), 2004 WL 628784, at *1 (S.D.N.Y. Mar. 29, 2004), aff'd, 459 F.3d 241 (2d Cir. 2006). Nevertheless, where a plaintiff "suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay." Graham v. Wright, No. 01-CV-9613 (NRB), 2004 WL 1794503, at *5 n.7 (S.D.N.Y. Aug. 10, 2004) (citing Smith, 316 F.3d at 186), aff'd, 136 F. App'x 418 (2d Cir. 2005).

Courts must "consider the absence of adverse medical effects in evaluating the objective sufficiency of [an] Eighth Amendment claim." Smith, 316 F.3d at 187 ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue."). Where, as here, the plaintiff proceeds on a theory that a delay in his treatment constituted deliberate indifference, "multiple district courts in this Circuit, and at least four Circuit courts, have concluded that a plaintiff who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Ray v. Zamilus, No. 13-CV-2201 (PGG), 2017 WL 4329722, at *10 (S.D.N.Y. Sept. 27, 2017) (collecting cases). To illustrate, "[n]umerous courts have considered whether a delay in providing treatment for Hepatitis C rises to the level of an Eighth Amendment violation, and where such claims have survived summary judgment, they generally have been supported by medical evidence demonstrating that the delay in treatment either made the eventual treatment less effective, or presented a risk that treatment would be less effective. Id. (collecting cases); see also Parks v. Blanchette, 144 F. Supp. 3d 282, 314 (D. Conn. 2015) (finding that plaintiff "introduced evidence sufficient to raise a genuine question of material fact as to whether the delay in receiving Hepatitis C treatment was sufficiently serious" where plaintiff's expert "has indicated that a delay in treatment for Hepatitis C decreases its effectiveness").

By contrast, "where a plaintiff has not offered medical evidence demonstrating disease progression or a worse prognosis, defendants have been granted summary judgment." Id.; see also Byng v. Wright, No. 09-CV-9924 (PKC), 2012 WL 967430, at *10 (S.D.N.Y. Mar. 20, 2012) (finding that plaintiff's "allegation [of a delay in treatment of his Hepatitis C] . . . fails under both prongs of the deliberate indifference standard," because he "comes forward with no evidence that

13

he sustained a serious adverse health effect between his September 27 visit with Dr. Mamis and his October 23 consultation with Dr. Rush"); Farid v. Ellen, No. 01-CV-8292 (PKC), 2006 WL 59517, at *10-11 (S.D.N.Y, Jan. 11, 2006), aff'd, 593 F.3d 233 (2d Cir. 2010) (granting summary judgment in Hepatitis C case, where "[d]espite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"; "no reasonable jury could conclude that the alleged delay in plaintiff's medical treatment caused any harm to him that would be actionable under the Eighth Amendment").

Here, the evidence shows that Dr. Koenigsmann only became involved in decisions relating to Ocampo's treatment for Hepatitis C in June 2011, when he responded to a request for retreatment by Ocampo's primary care physician, Dr. Jean-Baptiste. (56.1 ¶¶ 82-87.) At that time, Dr. Koenigsmann denied Ocampo's request for treatment with Dual Therapy because it previously caused Ocampo to suffer negative side effects and, in any event, was unsuccessful. (Id. ¶¶ 85-86; Koenigsmann Decl. ¶¶ 40-41; see also Bozer Decl. ¶ 79.) He also deferred treatment with the then-new Triple Therapy because DOCCS was still developing a protocol to ensure safe administration of it, and Ocampo had not yet completed the requisite testing. (Id.) Importantly, there is no evidence that had Koenigsman recommended Double or Triple Therapy treatment at this time, Ocampo would have achieved a better outcome. See, e.g., Ray, 2017 WL 4329722, at *12 (granting summary judgment where plaintiff had not "introduced 'verifying medical evidence' that his Hepatitis C condition worsened as a result of the delay in treatment, or that he faced a worse prognosis as a result of the delay in treatment").

To the contrary, according to defendants' medical expert, Dr. Korsten, even if Ocampo had received Triple Therapy in 2011 or 2012, "it is highly unlikely that this treatment would have

14

resulted in a sustained viral response of no HCV" because Ocampo subsequently failed Triple Therapy. (Korsten Decl. ¶ 22.) Dr. Kortsen opined that Ocampo's condition "did not evolve" during this time period and "there is no evidence—either clinical or laboratory—to indicate that Ocampo's condition worsened significantly as a result of not receiving drug therapy" between 2011 and 2012. (Id. ¶ 25.) In addition, Dr. Korsten opined that the delay in retreatment between 2011 and 2012 did not reduce the likelihood that Ocampo's Hepatitis C or the associated cirrhosis could be treated in the future. Furthermore, the evidence shows that Ocampo never responded to either Dual or Triple Therapy; the only treatment that he responded positively to was Harvoni in 2016—a treatment that became available only after Ocampo's release in 2014. (56.1 ¶¶ 119–21; Korsten Decl. ¶¶ 18–20.)

Ocampo's expert, Dr. Kirby, does not contradict these statements or offer any evidence that Ocampo sustained any harm from the failure to obtain drug therapy in 2011 and 2012. Instead, Dr. Kirby offers the unadorned legal conclusion that the delay "demonstrated deliberate indifference to Mr. Ocampo's medical needs." (Kirby Rept. at 19.) That is insufficient to create a triable issue of fact.

The Court finds that Ocampo has not offered evidence sufficient to demonstrate that "the alleged delay in his Hepatitis C treatment (1) caused his Hepatitis C condition to worsen; (2) presented a risk that the eventual treatment would not be successful or otherwise caused him to have a worse prognosis; or (3) caused any adverse medical effect." Ray, 2017 WL 4329722, at *12. Because Ocampo has not offered evidence sufficient to create a material issue of fact as to the objective prong of the Eighth Amendment inquiry, defendants are entitled to summary judgment.

Additionally, even if there were evidence establishing a triable issue of fact on the objective prong of Ocampo's deliberate indifference claim, summary judgment would still be granted because he fails to satisfy the subjective prong. The most that Ocampo's expert can say for Koenigsmann's culpability is that his treatment "deviated from generally accepted standards of medical care." (Kirby Rept. at 19.) Mere medical malpractice or negligence, however, is insufficient to meet the subjective prong of a deliberate indifference claim. See Hathaway, 99 F.3d at 553 (noting that "negligent malpractice does not state a claim of deliberate indifference."); Williams v. Koenigsmann, No. 03-CV-5267 (SAS), 2004 WL 315279, at *6 (S.D.N.Y. Feb. 18, 2004) (finding that "a course of treatment [that] is unsuccessful does not even establish medical malpractice . . . . A fortiori, it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice" (citing Ramos v. Artuz, No. 00-CV-149, 2003 WL 342347, *9 (S.D.N.Y. Feb. 14, 2003))). Consequently, no triable issue of fact exists on the subjective prong of Ocampo's deliberate indifference claim. Accordingly, summary judgment is granted on Ocampo's claim under the Eighth Amendment.

## CONCLUSION

The Court grants defendants' motion for summary judgment on Ocampo's remaining claim. The Clerk is directed to enter judgment accordingly.

SO ORDERED.

Dated: March 27, 2018
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge